UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                  :

EXOSOME DIAGNOSTICS, INC.      :     No.

                    Plaintiff,   :

                     :

            v.          :

EREZ EITAN and NEURODEX, INC.  :

               Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## <u>COMPLAINT</u>

1.    Exosome, a Waltham-based company, has worked for years and expended substantial resources to become a pioneer in the field of "liquid biopsy." Exosome's highly specialized and proprietary techniques allow for less-invasive medical diagnoses, and are extremely valuable to researchers, collaborators, patients, and the company itself. Eitan, a former Exosome scientist, has placed all of that at risk. Eitan has breached his agreements to protect the company's trade secrets and to abstain from unfair competition, and has instead stolen Exosome's information, and founded NeuroDex, a directly competing company. This action aims to halt that unlawful and unfair competition, and to enforce the binding Confidentiality and Non-Compete Agreements that Eitan knowingly entered just over one year ago.

2.    Exosome is a world leader in the field of liquid biopsy, a technique for diagnosing and determining appropriate treatment for disease without invasive procedures. Exosome has spent immense resources to develop complex methods and techniques for isolating particles called "exosomes" from various biofluids in the human body and linking the signals sent by those exosomes to diseases such as breast cancer, Parkinson's Disease, and Alzheimer's Disease.

3.      Eitan joined Exosome in January 2017 to research and develop liquid biopsy solutions for neurodegenerative diseases such as Parkinson's Disease and Alzheimer's Disease. As a condition for joining Exosome, Eitan agreed to assign any research developments to Exosome; not to use or permit to be used Exosome's trade secrets for any purpose besides his work at Exosome; and not to compete with Exosome for one year upon the end of his employment.

4.      As part of his job at Exosome, Eitan conducted research as part of Exosome's collaboration with Partner 1.  The end goal of that research was to develop a liquid biopsy solution for identifying the presence of Parkinson's Disease in a tissue sample.

5.      In the scope of his employment, and in accordance with his employment contracts, Eitan had to create "protocols,"—documentations of the experiments he performed on Exosome's behalf.  Instead, Eitan withheld the actual protocol from Exosome, conducted research with no written documentation, and later falsified the protocol, all in an apparent attempt to steal for himself the process and results that he was being paid to deliver for Exosome.

6.      This was hardly Eitan's only unfair, unlawful, and unfaithful act.  Indeed, just months after he joined Exosome, Eitan began to secretly consult for another company that researches neurodegenerative disease.  Eitan did not obtain permission for this consultancy, as required by his employment agreements.  Exosome terminated Eitan's employment within days of learning of Eitan's moonlighting.

7.      After Eitan's dismissal, Exosome learned that Eitan had falsified the protocol for the Partner 1 partnership.  For example, the fraudulent protocol contained references to chemicals that could not have been used during the experiment because they were not even available in the lab.  And the protocol failed to identify the actual chemicals that had been used.  The protocol also

contained various other internal consistencies.  Exosome has been left to create, from scratch, the very experiment that Eitan was hired to perform on Exosome's behalf.

8.      After his termination, Eitan first tried to get hired at Partner 1.  Exosome learned that Eitan sought to interfere with Exosome's working collaboration with Partner 1.  Exosome has come to understand that Eitan bragged that he, and only he, had personal knowledge of what made the Parkinson's experiment successful—even though he was supposed to perform and document the experiment for Exosome.

9.      Next, Eitan founded NeuroDex, a company that purports to specialize in neurodegenerative diagnostics based on exosomal research—Eitan's precise responsibility at Exosome.

10.     Eitan's founding and working at NeuroDex constitutes a clear violation of his agreements not to compete with Exosome.  Moreover, by moving forward at NeuroDex, Eitan imperils Exosome's confidential and proprietary information, trade secrets, and business plans.

### THE PARTIES

11.     Exosome is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Waltham, Massachusetts.

12.     Eitan was a Scientist at Exosome from January 2017 through June 2018.

13.     NeuroDex, Inc. is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Massachusetts.

### JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) as this matter presents a federal question.  This Court has supplemental jurisdiction over Exosome's state law claims under 28 U.S.C. § 1367(a).

15.     This Court has personal jurisdiction over Eitan because, pursuant to the Non-Competition, Non-Solicitation, Confidentiality and Assignment Agreement he entered into with Exosome on January 4, 2017, Eitan expressly submitted to the jurisdiction of this Court, and because Eitan is a resident of Massachusetts.

16.     This Court has personal jurisdiction over NeuroDex because its principal place of business is in Massachusetts.

17.     Venue is proper in this District because Exosome has its headquarters here and certain key acts alleged herein occurred in this District. Additionally, Eitan consented to this venue in his employment agreements.

## FACTUAL ALLEGATIONS

**Exosome's Business Depends on its Confidential and Trade Secret Information that Facilitates Accurate Liquid Biopsies.**

18.     Exosome is a world-leader in developing sophisticated, detailed diagnostic analyses using proteins contained in parts of biofluids such as blood plasma, a form of analysis known as "liquid biopsy." This liquid biopsy technique is highly coveted, because studying a patient's blood is far less invasive than, for example, taking a biopsy from a patient's brain tissue. Exosome's technique focuses on exosomes, which are particles released from cells throughout the body into biofluids such as blood, urine, cerebrospinal fluid, and saliva. These particles, when properly extracted and analyzed, contain biomarkers indicative of disease and a patient's likely response to treatment.

19.     Exosome Diagnostics' founding scientist and Chief Scientific Officer Johan Skog is credited with discovering that exosomes contain nucleic acids, including DNA and RNA, which can be harvested and used for diagnoses, treatment selection, and patient monitoring. In 2008, Dr. Skog published an article, based on his work at Massachusetts General Hospital and Harvard

Medical School, showing that exosomes could be extracted from patients' blood and used to identify mutations in glioblastoma tumors.  That same year, Dr. Skog founded Exosome.

**Exosome Developed the EDDE Platform and Liquid Biopsy Tests Through Substantial Effort and Investment.**

20.     Exosome spent substantial time, resources, and funds to develop different Exosome isolation platforms, including the "Exosome Diagnostic Depletion or Enrichment" platform (the "EDDE platform") that enables scientists to separate the relevant exosomes from the irrelevant exosomes in specific fluids and for specific conditions.

21.     In 2016, following years of research and development, Exosome released two liquid biopsy tests for patients: "ExoDx® Prostate [IntelliScore]," or "EPI," a urine-based analysis which helps assess the need for a prostate biopsy, and "ExoDx® Lung (ALK)," which identifies gene mutations that inform treatment decisions for patients with non-small cell lung cancer.  These breakthroughs remain the world's only two clinical exosome tests.

**Exosome's "Liquid Biopsy" Approach Requires Vast Know-How to Develop and Execute.**

22.     Exosomal analysis is less invasive and more convenient for patients than other diagnostic techniques such as tissue biopsies.  But the biofluids from which exosomes are extracted, such as plasma, typically contain many thousands of particles other than the single exosome type that is useful for a particular diagnostic application.  Those additional particles produce "noise" that can disrupt whatever "signal" could otherwise be divined from analysis of the target exosome.

23.     Exosome has invested substantial time, resources, and tens of millions of dollars to develop multi-stage techniques for eliminating noise and isolating the target signal.  These confidential techniques allow Exosome's scientists to separate healthy patients and patients with disease.  The techniques differ from one diagnostic application to the next.

24.     Exosome's technology is directly related to interstate and international commerce, with commercial collaborations and applications in Maryland, Germany, and Japan.  Its testing and laboratory services are available to insured Americans in all fifty states.  Indeed, Exosome is a global leader in liquid biopsy because of its proprietary and confidential techniques for isolating useful biomarkers from the thousands of other kinds of particles in plasma.  Partners, including major pharmaceutical companies, engage Exosome to develop specific techniques to diagnose particular diseases without costly and invasive tissue biopsy.

25.     The techniques Exosome uses to complete these projects derive their value from being kept confidential.  On information and belief, if Exosome's methods for isolating and analyzing exosomes were to become public, Exosome's partners would have no reason to pay Exosome to develop them.

26.     Similarly, on information and belief, if such techniques were to suddenly become available from a cut-rate source, such as Eitan or NeuroDex, who did not need to perform comparable investment to develop the techniques, Exosome's investment would be squandered, and its market position compromised.

27.     This is not a hypothetical threat.  Rather, multiple competitors have already tried and failed to develop comparable exosomal research and development programs.  Today, some of those competitors have instead turned to licensing slimmed-down versions of Exosome's technology.  Exosome derives significant revenue from these licensing agreements.

28.     Exosome has also invested substantial time, resources, and funds developing its business model; knowledge of the industry; business and marketing methodologies; partner base and potential partner base, including targets for future marketing efforts; as well as its strategic

roadmap for the services it provides, and its plans for marketing and growth.  This is part of "Exosome's Confidential and Trade Secret Information"—the central driver of Exosome's value.

29.     In June, Bio-Techne Corporation agreed to purchase Exosome for $250 million in cash plus contingent consideration of up to $325 million.  This purchase price, which could exceed half a billion dollars if targets are met, reflects the value of Exosome's proprietary diagnostic tests.

30.     Finally, Exosome has accrued substantial goodwill in its industry.  This goodwill is of significant value to Exosome, and is a function of Exosome's reputation as an industry leader. On information and belief, if a former employee were to steal or make public Exosome's confidential information, or otherwise improperly trade on Exosome's reputation, it would substantially diminish Exosome's hard-earned goodwill.  Eitan has apparently done both.

**Exosome Protects Its Confidential and Trade Secret Information.**

31.     Exosome uses a variety of measures to maintain the secrecy of its Confidential and Trade Secret Information.  For example, Exosome has nondisclosure agreements with employees, contractors, vendors, suppliers, and business partners.  Its employment agreements state: "You agree to maintain the confidentiality of all confidential and proprietary information of the Company."   Eitan signed his employment agreement as a condition of his employment on September 28, 2016.  (Ex. A.)

32.     Similarly, the Non-Competition, Non-Solicitation, Confidentiality and Assignment Agreement ("Non-Compete Agreement") signed by Exosome employees states: "I agree that all information, whether or not in writing, concerning the Company Group's business, technology, assets, business relationships or affairs that the Company Group has not released to the general public (collectively, 'Proprietary Information') is and will be the exclusive property of the company."  In that agreement, "Proprietary Information" is defined to include "operational and technological information, including plans, specifications, manuals, forms, templates, software,

designs, methods, procedures, formulas, discoveries, inventions, improvements, concepts and ideas." Eitan signed his Non-Compete Agreement as a condition of his employment on January 4, 2017. (Ex. B.)

33.     Exosome also uses physical security measures to protect its Confidential and Trade Secret Information, including restricting entry into Company facilities.

34.     In addition, Exosome controls and monitors access to its electronic files. Users must be granted permission to access certain sets of files and can only access files related to their employment. For example, only scientists and related support staff can access files containing Exosome's diagnostic protocols. Exosome's computer systems are password-protected; employees are not permitted to disclose their passwords to anyone else. Exosome also employs other electronic security measures, including firewalls.

**Eitan's Employment with Exosome Gave Him Access to Trade Secret Information.**

35.     Eitan worked for Exosome from January 2017 until June 13, 2018, first as a Scientist and later as a Senior Scientist.

36.     Exosome hired Eitan to develop for the company protocols for pulling down and analyzing neuronal exosomes. From neuronal exosomes, it is possible to derive RNA and other protein-biomarkers of nervous system disorders, including Alzheimer's and Parkinson's Disease.

37.     During his employment, Eitan had access to, and was entrusted with, the Exosome Confidential and Trade Secret Information. Not only did Eitan have access to preexisting secrets; he was paid to develop for the company new Confidential and Trade Secret Information, as he was responsible for developing protocols for isolating neuronal exosomes for analysis. These protocols were to document the confidentially developed, specialized techniques unique to each diagnostic application.

**Eitan Entered Binding Agreements with Exosome.**

38.     Eitan's signed Employment Agreement and Non-Compete Agreement include provisions requiring Eitan not to compete with Exosome or misappropriate Exosome's confidential information.   Among other key provisions:

- Eitan cannot "engage in any other employment, occupation, consulting or other business activity directly related to the [Company's] business."

- Eitan cannot "directly or indirectly . . . engage, participate or invest in any business activity . . . that develops, manufactures or markets any products, or performs any services related to the Business," which includes "research, development and commercialization of Exosome-based . . . products for diagnostic or therapeutic use."

- Eitan acknowledges that "all information, whether or not in writing, concerning the Company Group's business, technology, assets, business relationships or affairs that the Company Group has not released to the general public . . . is and will be the exclusive property of the Company."   Exosome's proprietary information includes "operational and technological information, including plans, specifications, manuals, forms, templates, software, designs, methods, procedures, formulas, discoveries, inventions, improvements, concepts and ideas."

- Eitan cannot "disclose any Proprietary Information to anyone outside of the Company Group, or use or permit to be used any Proprietary Information for any purpose other than the performance of my duties as an employee of the Company."

- Eitan was obligated to "maintain adequate and current records of all Proprietary Information and Company-Related Developments developed by me during my employment, which records will be available to and remain the sole property of the Company at all times."

39.     Eitan breached these provisions in myriad ways, including his secret consulting; his failure to adequately record his experiments; his misappropriation of technological information belonging to Exosome; and his founding of, and engagement with, the direct competitor NeuroDex.

**Eitan Hid Developments from Exosome.**

40.     Like all Exosome's scientists, Eitan was required to record his work.   This practice—standard operating procedure in the commercial scientific world—included maintaining

records, called "protocols," of techniques for isolating and analyzing exosomes associated with various neuronal diseases, including Alzheimer's Disease and Parkinson's Disease.

41.     During his tenure, Eitan repeatedly failed to maintain protocols. His performance review indicated that he "needed improvement" in the realm of "patent-safe documentation."

42.     Eitan's continued failure to document his work—and his simultaneously keen interest in researching the boundaries of Exosome's patent protection—led colleagues to question whether Eitan was avoiding a paper trail so that he could later claim intellectual property rights in the work he had actually performed for Exosome.

43.     In 2018, using Exosome's EDDE platform, Eitan helped develop a technique to analyze exosomes for the presence of a certain neuronal bio-marker. This technique was developed for Partner 1, a major Exosome partner with which Exosome has an ongoing financially beneficial relationship.

44.     Instead of documenting the technique in a protocol as required, Eitan hid the technical details and falsified the experiment's records, apparently to smuggle out of the company Exosome's Confidential and Trade Secret Information.

45.     Exosome conducted an experiment in which the same assay was performed by Eitan and an independent operator. Eitan took pains to avoid sharing with the second operator which materials were being used.

46.     For example, Eitan refused to provide a protocol to the other operator in advance. Eitan also "pre-mixed" various reagents used in the experiment to avoid revealing their composition to the other operator.

47.     After the experiment succeeded, Eitan created a fraudulent protocol to avoid sharing the actual technique with his employer, Exosome. The misleading post-hoc protocol Eitan

drafted includes references to chemicals that could not have been used because they were not even on the premises at the time.

48.     Eitan's protocol further contains internal inconsistencies about the constitution and concentration of certain substances that were used, and describes techniques not actually used during the course of the experiment.

49.     Exosome reasonably relied on Eitan's protocol, as a scientist in the company's employ should have no reason to deceive his employer.  Yet as time revealed, Eitan defrauded Exosome, much to Exosome's harm.  Exosome has had to divert substantial resources to efforts to recreate what Eitan should have done and recorded, when he instead stole that information for his own purposes.  This has not only cost Exosome financially, but also siphoned off resources that would have been spent developing other breakthroughs in promising areas that would have helped patients and further enhanced the company's reputation.

50.     To this day, Eitan has not revealed the actual technique he used to anyone at Exosome, though Exosome understands that he is marketing himself as the individual in possession of the "secret sauce."

**June 2018: Eitan's Deceit Leads to His Departure.**

51.     In June 2018, Exosome became aware that Eitan had been working secretly as a consultant for a company called Cogentis Therapeutics ("Cogentis").  Cogentis researches neurodegenerative diseases including Alzheimer's disease.  Eitan had never obtained authorization for the consulting work.

52.     Exosome only discovered Eitan's double-dipping when an Exosome employee discovered a photograph of Eitan posing as part of the Cogentis team holding an oversized award check for thirty thousand dollars.  Shortly after this discovery, Eitan was terminated, effective July 2, 2018.

53.     As part of his exit interview, Eitan signed a termination agreement acknowledging his "continuing obligations" under the Non-Compete Agreement.  The agreement also required Eitan to "return documents and materials containing Proprietary Information."  (Ex. C.)

54.     Following the meeting in which he was terminated, Eitan claimed that he had personal materials, including photographs, on his Exosome laptop that he needed to download before leaving.  Eitan proceeded to migrate files from his Exosome laptop onto multiple portable flash drives.  On information and belief, those flash drives had serial numbers 5F0F9618&0 and 75896F68&0.  Eitan has not returned those flash drives or their contents, even though his contract requires the return of any and all Exosome property.

55.     Within weeks of his termination, Eitan, in possession of Exosome's "secret sauce," contacted Partner 1—the very company whose experiment he had been working on for Exosome, while hiding the actual protocol from Exosome—offering his services.  Exosome later came to understand that Eitan had suggested to Partner 1 that he, and not Exosome, was in possession of the confidential information essential to the experiment's success.

**November 2018: Exosome Discovers that Eitan Founded NeuroDex, A Directly Competing Company.**

56.     Weeks ago, Exosome discovered that Eitan founded NeuroDex, "a diagnostics development company focused on developing blood-based diagnostic tests utilizing neuron-derived exosomes isolation technology," according to the NeuroDex website at www.NeuroDex.co.  By its own terms, NeuroDex is squarely competing with Exosome, in breach of Eitan's Non-Compete Agreement.

57.     NeuroDex's website states that "NeuroDex is developing a blood test for Alzheimer's Disease (AD) and other neurological indications."  Eitan is Listed as "Co-Founder

and Chief Scientific Officer" of the company, which is incorporated in Delaware but operates in Massachusetts.

58.     Eitan never informed Exosome of his plan to found NeuroDex.

59.     The Massachusetts-based non-profit mentoring program MassBio recently selected NeuroDex for a "round of mentorship" pairing it "with a team of mentors, based on their individual objectives and needs, for eight weeks of hands-on coaching as they seek to develop business plans, launch companies and raise capital."  The MassBio announcement described NeuroDex as a "diagnostics development company" with "technology [] based on the isolation of brain derived exosomes."

60.     These words, like Eitan's own words, succinctly capture the overlap between Exosome and NeuroDex.  For Exosome, Eitan worked on isolating "exosome[s] . . . for neurodegenerative disease," and for NeuroDex, he would work on "exosomes isolation technology" for neurodegenerative conditions.  Given this overlap, Eitan cannot work for NeuroDex without inevitably disclosing Exosome's Confidential and Trade Secret Information.

61.     Eitan nowhere indicates how his founding this new company in the exosome market squares with his agreement not to compete for a year after his employment with Exosome in the "research, development [or] commercialization of Exosome-based . . . products for diagnostic or therapeutic use."

## CLAIMS FOR RELIEF

## COUNT I

### Breach of Contract (Employment Agreement) (Eitan)

62.     Exosome re-alleges and incorporates by reference each and every aforementioned allegation of this Complaint.

63.     The Employment Agreement is a binding and enforceable contract that Eitan signed at the outset of his employment with Exosome, for sufficient consideration, as a condition of his employment.  The terms of the Employment Agreement are reasonable and necessary to protect Exosome's goodwill and confidential and proprietary work product and trade secret information.

64.     Exosome has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Employment Agreement, including payment of Eitan's salary during the course of his employment.

65.     Eitan unjustifiably and inexcusably breached the Employment Agreement and harmed Exosome at least by engaging in a consulting relationship with a company directly related to Exosome's business, and by failing to maintain the confidentiality of Exosome's confidential and proprietary information, including its confidential protocols for exosomal analysis.

66.     Eitan has threatened future breaches by founding NeuroDex, a business that directly competes with Exosome, and which will cause Eitan to disclose Exosome's confidential and proprietary information and trade secrets.

67.     Exosome has suffered and continues to suffer damages, and also faces the imminent threat of irreparable harm, arising from Eitan's multiple breaches of his Employment Agreement. These harms include a decrease in the value of Exosome's confidential and proprietary information and trade secrets, and in the value of Exosome's business.

68.     Exosome is entitled to its costs and attorney's fees arising from Eitan's multiple breaches of his Employment Agreement.

## **COUNT II**

### **Breach of Contract (Non-Compete Agreement) (Eitan)**

69.     Exosome re-alleges and incorporates by reference each and every aforementioned allegation of this Complaint.

70.     The Non-Compete Agreement is a binding and enforceable contract that Eitan signed at the outset of his employment with Exosome, for sufficient consideration, as a condition of his employment.  The terms of the Non-Compete Agreement are reasonable and necessary to protect Exosome's goodwill and its confidential and proprietary work product and trade secret information.

71.     Exosome has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Non-Compete Agreement, including payment of Eitan's salary during the course of his employment.

72.     Eitan unjustifiably and inexcusably breached the Non-Compete Agreement and harmed Exosome at least by engaging in business activity, in the form of a consulting relationship, with a company directly performing services and marketing products related to Exosome's business; by failing to make full and prompt disclosure to Exosome of his research developments, including protocols for exosomal analysis; by failing to maintain adequate and current records of those research developments; by misappropriating Exosome's confidential and proprietary information, including its operational and technological information such as protocols for exosomal analysis; by disclosing, using, and permitting to be used Exosome's confidential and proprietary information; and by founding and participating in NeuroDex, which develops and markets products and performs services that directly compete against Exosome, within the twelve-month period following the termination of Eitan's employment at Exosome.

73.     Eitan continues to unjustifiably and inexcusably breach his obligations under the Non-Compete Agreement by participating in the competing venture, and, on information and

belief, by using and disclosing Exosome's confidential and proprietary work product and trade secret information to individuals outside of Exosome, including employees and customers of NeuroDex.

74.     Eitan also threatens future breaches by founding NeuroDex, a business that directly competes with Exosome, and which will cause Eitan to disclose Exosome's confidential and proprietary information and trade secrets and entail continued breach of the provision not to compete with Exosome.

75.     Exosome has suffered and continues to suffer damages, and also faces the imminent threat of irreparable harm from loss of goodwill and the protection of trade secrets and confidential information, arising from Eitan's multiple breaches of the Non-Compete Agreement.  These harms include a decrease in the value of Exosome's confidential and proprietary information and trade secrets, and in the value of Exosome's business.

76.     Exosome is entitled to its costs and attorney's fees arising from Eitan's multiple breaches of his Non-Compete Agreement

## COUNT III

### Tortious Interference with Contractual Relations (NeuroDex)

77.     Exosome re-alleges and incorporates by reference each and every aforementioned allegation of this Complaint.

78.     Exosome has contractual relations, including his Employment Agreement and Non-Compete Agreement, with Eitan.

79.     On information and belief, NeuroDex was aware of Exosome's contracts with Eitan because Eitan is a founder of NeuroDex.

80.     On information and belief, NeuroDex knowingly and intentionally induced Eitan to breach his contracts with Exosome by pursuing commercial liquid biopsy solutions requiring

Eitan to rely on and use Exosome's trade secret information; and by competing, with Eitan as its Chief Scientific Officer, in the same space as Exosome, requiring Eitan to breach his obligations not to compete with Exosome for one year after his departure.  NeuroDex did so with the improper motive to injure Exosome and used improper means, including acquisition of Exosome's confidential and trade secret information.

81.     Exosome has suffered harm resulting from NeuroDex's interference in its contracts with Eitan, including having to dedicate substantial funds, company resources, and Exosome employees' time to trying to recover its misappropriated trade secrets, and damage to Exosome's business value and prospects due to Eitan's competing with Exosome in the liquid biopsy space in violation of his contracts.

82.     As a direct and proximate result of NeuroDex's interference, Exosome has been damaged in an amount to be ascertained at trial.

## COUNT IV

### Violation of Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1836 et seq. (Eitan and NeuroDex)

83.     Plaintiff re-alleges and incorporates by reference each and every aforementioned allegation of this complaint.

84.     Exosome maintains and has maintained a vast amount of confidential and proprietary information and know-how concerning exosome isolation and analysis, protocols for particular diagnostic assays, business ideas and plans for the liquid biopsy industry, and its knowledge of its existing and prospective client base.

85.     This confidential and proprietary work product and trade secret information relates, among other things, to Exosome's diagnostic applications for liquid biopsy that are used, sold,

shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

86.     Exosome has taken reasonable measures to keep such information secret and confidential.

87.     Exosome has at all times maintained stringent security measures to preserve the secrecy of such information.  Among other things, Exosome has nondisclosure agreements with employees, contractors, vendors, suppliers, and business partners.  Exosome uses physical security measures such as restricting entry into Company facilities, and employs electronic security measures such as restricting access to files and folders, firewalls, and password protections.  Exosome also requires that its employees not take with them any confidential or proprietary work product or trade secret information upon their departure from the company.  Eitan signed his Employment Agreement and Non-Compete Agreement with Exosome in which he agreed to the confidentiality and non-disclosure of Exosome's trade secrets.

88.     Due to these security measures, Exosome's trade secrets are not available for others to use through any legitimate means.

89.     Exosome's trade secrets derive independent value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

90.     Eitan improperly and unlawfully misappropriated Exosome's trade secret information at a minimum by hiding and disguising it and then keeping it for personal use upon his departure from Exosome.

91.     On information and belief, Eitan formed NeuroDex with the intent and purpose of misappropriating Exosome's trade secret information and of using this information for the

commercial advantage of NeuroDex in order that NeuroDex could compete with Exosome in the liquid biopsy industry, and would not have to incur the expense and spend the time necessary to research its own technology and protocols for exosomal analysis.

92. On information and belief, Eitan's misappropriation of Exosome's trade secret information, including its confidential protocols for exosome assays, was intentional, knowing, willful, malicious, fraudulent, and oppressive.

93. On information and belief, NeuroDex's misappropriation of Exosome's trade secret information, including its confidential protocols for exosome assays, was intentional, knowing, willful, malicious, fraudulent, and oppressive.

94. On information and belief, if Eitan is not enjoined, he will continue to misappropriate and use Exosome's trade secret information for his own benefit and to Exosome's detriment.

95. Moreover, because of Eitan's extensive knowledge of Exosome's trade secrets and the similarity of his own new business venture, Eitan's and NeuroDex's use and misappropriation of Exosome's trade secrets is inevitable and subject to the doctrine of inevitable disclosure.

96. As the direct and proximate result of Eitan's and NeuroDex's conduct, Exosome will suffer and, if Eitan's conduct is not enjoined, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be determined at trial.

97. Because Exosome's remedy at law is inadequate, it seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its confidential and proprietary work product and trade secret information from further use or disclosure.

98. Exosome is also entitled to an award of exemplary damages and recovery of its attorney's fees incurred herein.

## COUNT V

### Common Law Trade Secret Misappropriation (Eitan and NeuroDex)

99.     Exosome re-alleges and incorporates by reference each and every aforementioned allegation of this Complaint.

100.     Exosome has an array of trade secret information, including know-how concerning exosome isolation and analysis, protocols for particular diagnostic assays, business ideas and plans for the liquid biopsy industry, and its knowledge of its existing and prospective client base.

101.     Exosome's confidential and proprietary trade secret information has independent economic value from not being generally known to the public and has provided Exosome with a legitimate commercial advantage over actual and would-be competitors.   Exosome invested millions of dollars, and substantial time and resources, to develop this information, including its exosome assays and proprietary EDDE technology used to develop them.  Exosome has made, and continues to make, diligent efforts to protect its confidential and proprietary work product and trade secret information, including physical, contractual, and electronic security measures. Exosome continues to use this confidential trade secret information as part of its ongoing partnerships and business development.  Accordingly, such information constitutes "trade secrets" under Massachusetts law.

102.     Exosome's current and former employees, including Eitan, were under a common law and contractual duty to maintain in confidence Exosome's trade secrets and proprietary information, and not to use or disclose such information.

103.     On information and belief, Eitan has actually used or disclosed, and has threatened to use or disclose, Exosome's proprietary and trade secret information, including assays for exosome analysis, and has done so with knowledge.  Eitan's use or disclosure of such information

has been and will continue to be in direct violation of his contractual obligations to Exosome, and in direct violation of Massachusetts law.

104.   On information and belief, Eitan formed NeuroDex with the intent and purpose of misappropriating Exosome's trade secret information and of using this information for the commercial advantage of NeuroDex in order that NeuroDex could compete with Exosome in the liquid biopsy industry, and would not have to incur the expense and spend the time necessary to research its own technology and protocols for exosomal analysis.

105.   On information and belief, Eitan has willfully and maliciously misappropriated and/or wrongfully used Exosome's trade secret information as described above, and continues to misuse the above-described trade secrets for purposes of personal gain and/or gaining a competitive advantage over Exosome in the liquid biopsy industry.

106.   On information and belief, NeuroDex has willfully and maliciously misappropriated and/or wrongfully used Exosome's trade secret information as described above, and continues to misuse the above-described trade secrets for purposes of personal gain and/or gaining a competitive advantage over Exosome in the liquid biopsy industry.

107.   Moreover, because of Eitan's extensive knowledge of Exosome's trade secrets and the overlap with his own new business venture, Eitan's and NeuroDex's use and misappropriation of Exosome's trade secrets is inevitable and subject to the doctrine of inevitable disclosure.

108.   On information and belief, Eitan and NeuroDex have gained, or will gain, substantial benefit from his use of Exosome's trade secrets to Exosome's substantial detriment.

109.   As a result of Eitan's and NeuroDex's said unlawful conduct, Exosome's trade secret information has been threatened and/or compromised.

110.     As a direct and proximate result of Eitan's and NeuroDex's misappropriation of trade secrets, actual or threatened, Exosome has been damaged in an amount to be ascertained at trial.

111.     Unless enjoined by this Court, said misappropriation of trade secrets threatens to and will cause great and irreparable injury to Exosome, and Exosome has no adequate or other remedy at law for such acts and threatened acts.

112.     Because the above described conduct was willful, wanton, malicious and oppressive, Exosome is entitled to an award of exemplary and punitive damages against Eitan in an amount to be determined at trial.

## COUNT VI

### Common Law Fraud (Eitan)

113.     Exosome re-alleges and incorporates by reference each and every aforementioned allegation of this Complaint.

114.     Eitan misrepresented that he had accurately documented his neuronal exosome research in protocols as contractually required, a material fact with significant business implications for Exosome.

115.     On information and belief, Eitan knew that the protocol he created to document his neuronal exosome research was false and contained material errors and omissions.

116.     On information and belief, Eitan created the false protocol with the purpose of inducing Exosome to pursue its product development with inaccurate information, so as to give him an unlawful and unfair advantage over Exosome.

117.     Exosome reasonably relied on Eitan's misrepresentation in continuing its product development and has since been harmed at least by having to divert substantial funds, company resources, and Exosome employees' time to trying to determine the true design of the experiments

Eitan performed in the scope of his employment at Exosome.  Exosome has also suffered damage to its business relationships and reputation as a result of Eitan's misrepresentation.

118.    As a direct and proximate result of Eitan's fraud, Exosome has been damaged in an amount to be ascertained at trial.

## COUNT VII

**Tortious Interference with Advantageous Business Relations (Eitan)**

119.    Exosome re-alleges and incorporates by reference each and every aforementioned allegation of this Complaint.

120.    Exosome has contractual and other advantageous relations with Partner 1, to Exosome's economic benefit, of which Eitan was aware in part because of the research he performed in connection with those relations.

121.    On information and belief, Eitan knowingly and intentionally interfered with those relations using improper motives to injure Exosome, including the motive to unlawfully compete with Exosome, and improper means, by misappropriating trade secret information essential to Exosome's fulfilling its contractual obligations, including exosome assays.

122.    Eitan violated his contractual duties to assign all developments to Exosome, to document his experimental protocols, and to protect Exosome's confidential information, in interfering with Exosome's relations with Partner 1, and Eitan's interference was thus improper in motive and means.

123.    Exosome has suffered harm resulting from Eitan's interference in its advantageous business relations with Partner 1, including having to dedicate substantial funds, company resources, and Exosome employees' time to trying to determine the experimental design Eitan misappropriated, and damage to Exosome's relations with Partner 1 both because of Exosome's

diminished ability to fulfill its current contractual obligations and a decreased likelihood of future business relations with Partner 1.

124.    As a direct and proximate result of Eitan's interference, Exosome has been damaged in an amount to be ascertained at trial.

## **COUNT VIII**

### **Tortious Interference with Contractual Relations (Eitan)**

125.    Exosome re-alleges and incorporates by reference each and every aforementioned allegation of this Complaint.

126.    Exosome has contractual relations, including signed statements of work, with Partner 1 of which Eitan was aware in part because of the research he performed under those contracts.

127.    On information and belief, Eitan knowingly and intentionally induced Partner 1 to break that contract by suggesting to Partner 1 that only he—and not Exosome—had the know-how and trade secret information necessary to fulfill Exosome's obligations under the contract.

128.    Eitan violated his contractual duties to assign all developments to Exosome, to document his experimental protocols, and to protect Exosome's confidential information, in interfering with Exosome's contractual relations with Partner 1, and Eitan's interference was thus improper in motive and means.

129.    Exosome has suffered harm resulting from Eitan's interference in its advantageous business relations with Partner 1, including having to dedicate substantial funds, company resources, and Exosome employees' time to trying to determine the experimental design Eitan misappropriated, and damage to Exosome's relations with Partner 1 both because of Exosome's diminished ability to fulfill its current contractual obligations and a decreased likelihood of future business relations with Partner 1.

130.     As a direct and proximate result of Eitan's interference, Exosome has been damaged in an amount to be ascertained at trial.

## COUNT IX

**Unfair Competition in Violation of M.G.L. c. 93A (Eitan and NeuroDex)**

131.     Exosome re-alleges and incorporates by reference each and every aforementioned allegation of this Complaint.

132.     On information and belief, NeuroDex and Eitan are developing blood-based diagnostic tests for clinical sales, seeking to raise funds, and pursuing business relations with pharmaceutical companies, and thus are engaged in trade or commerce in the Commonwealth of Massachusetts.

133.     Exosome develops diagnostic tests for clinical sales using blood and other biofluids, raises funds, and engages pharmaceutical and other companies in contractual and business relations, and thus is engaged in trade or commerce in the Commonwealth of Massachusetts.

134.     By using Exosome's misappropriated trade secret information to start a competing venture with an identical mission to Exosome, NeuroDex and Eitan have engaged in unfair methods of competition in violation of M.G.L. c. 93A, §§2 and 11.

135.     NeuroDex and Eitan's unfair competition have occurred primarily and substantially in the Commonwealth of Massachusetts, where NeuroDex has its principal place of business and is participating in a MassBio mentoring and business development program.

136.     On information and belief, NeuroDex and Eitan's unfair methods of competition in violation of M.G.L. c. 93A were knowing and willful.

137.    NeuroDex and Eitan's violations of M.G.L. c. 93A have directly and proximately caused Exosome substantial harm by reducing the value of its previously confidential trade secrets and its overall business value, diminishing its ability to satisfy its contractual obligations, and reducing its prospects for future business developments.

138.    NeuroDex and Eitan are liable to Exosome, pursuant to M.G.L. c. 93A §11, for the damages sustained by Exosome due to their violations of M.G.L. c. 93A, in an amount to be determined at trial.

139.    NeuroDex and Eitan are liable to Exosome, pursuant to M.G.L. c. 93A §11, for triple the damages sustained by Exosome, in an amount to be determined at trial, in light of NeuroDex and Eitan's knowing and willful violations of M.G.L. c. 93A.

140.    Exosome is also entitled to an award of exemplary damages and recovery of its attorney's fees incurred herein.

## COUNT X

### Common Law Unfair Competition (Eitan and NeuroDex)

141.    Exosome re-alleges and incorporates by reference each and every aforementioned allegation of this Complaint.

142.    By using Exosome's misappropriated trade secret information, in violation of federal and Massachusetts trade secret laws, to start a competing venture with an identical mission to Exosome, NeuroDex and Eitan have unfairly competed with Exosome.

143.    NeuroDex and Eitan's violations of M.G.L. c. 93A have directly and proximately caused Exosome substantial harm by causing a decline in the value of its previously confidential trade secrets and its overall business value, a diminishment in ability to fulfill its contractual obligations, and a decline in the value of its prospects for future business developments.

144.     NeuroDex and Eitan are liable to Exosome for the damages sustained by Exosome due to their unfair competition in an amount to be determined at trial.

## COUNT XI

**Aiding and Abetting Eitan's Violations of M.G.L. c. 93A and Unfair Competition (NeuroDex)**

145.     Exosome re-alleges and incorporates by reference each and every aforementioned allegation of this complaint.

146.     On information and belief, Eitan is developing blood-based diagnostic tests for clinical sales, seeking to raise funds, and pursuing business relations with pharmaceutical companies, and thus is engaged in trade or commerce in the Commonwealth of Massachusetts.

147.     By using Exosome's misappropriated trade secret information to start a competing venture with an identical mission to Exosome, Eitan has engaged in unfair methods of competition in violation of M.G.L. c. 93A, §§2 and 11, and the common law.

148.     On information and belief, Eitan's violations of M.G.L. c. 93A were willful and knowing.

149.     On information and belief, NeuroDex knew that Eitan was pursuing commercial interests using misappropriated trade secrets in the liquid biopsy space, and was engaging in unfair methods of competition in violation of M.G.L. c. 93A, §§2 and 11 and the common law.

150.     On information and belief, NeuroDex knew that Eitan's violations of M.G.L. c. 93A were willful and knowing.

151.     On information and belief, NeuroDex actively participated in and substantially assisted Eitan's pursuit of commercial interests using misappropriated trade secrets in the liquid biopsy space, and his engaging in unfair methods of competition in violation of M.G.L. c. 93A, §§2 and 11 and the common law.

152.     Exosome has been damaged by Eitan's violations of M.G.L. c. 93A, §§2 and 11 and the common law because those violations reduced the value of its previously confidential trade secrets and its overall business value, diminished its ability to satisfy its contractual obligations, and reduced its prospects for future business developments.

153.     NeuroDex is liable to Exosome for the damages sustained by Exosome which were caused by NeuroDex's aiding and abetting Eitan's conduct which violated c. 93A, §§2 and 11 and the common law.

154.     NeuroDex is liable to Exosome, pursuant to M.G.L. c. 93A, §11, for triple the damages sustained by Exosome, in an amount to be determined at trial, in light of NeuroDex's knowing and willful aiding and abetting Eitan's violations of c. 93A, §§2 and 11 and the common law.

## **PRAYER FOR RELIEF**

Plaintiff demands a trial by jury and respectfully requests that this Court:

**A.**     Enter a Preliminary Injunction order:

**1.**     Restraining and enjoining Eitan, from directly or indirectly:

**a.**     Engaging in any employment or business activity directly related to Exosome's business, including the development and commercialization of assays for exosome analysis and liquid biopsy products, and including at NeuroDex, for a period of twelve months;

**b.**     Offering or soliciting any Exosome client or potential client any business involving any product or service offered by Exosome, including, but not limited to, any assays for exosomal analysis or liquid biopsy products, or otherwise interfering with any of Exosome's contracts or advantageous business relationships;

**c.**     Using, permitting to be used, disclosing, or transmitting for any purpose any of Exosome's confidential or proprietary work product, trade secret, or business information, including but not limited to Exosome's protocols for

exosome analysis, information concerning Exosome's proprietary technologies, techniques, and developments, and the names, addresses, and specific information about Exosome's clients, pricing, research, and strategy;

2.    Requiring Eitan to return immediately to Exosome all originals, copies, and other reproductions, in any form whatsoever, of any and all documents of Exosome, including but not limited to the flash drives with the serial numbers 5F0F9618&0 and 75896F68&0, and (after preserving all materials in an appropriate manner for purposes of this litigation, including all metadata) to purge or destroy any computerized records Eitan has within his possession, custody, or control;

3.    Restraining and enjoining NeuroDex, from directly or indirectly:

   a.    Employing Eitan for a period of twelve months;

   b.    Offering or soliciting any Exosome client or potential client any business involving any product or service offered by Exosome, including, but not limited to, any assays for exosomal analysis or liquid biopsy products, or otherwise interfering with any of Exosome's contracts or advantageous business relationships;

   c.    Using, permitting to be used, disclosing, or transmitting for any purpose any of Exosome's confidential or proprietary work product, trade secret, or business information, including but not limited to Exosome's protocols for exosome analysis, information concerning Exosome's proprietary technologies, techniques, and developments, and the names, addresses, and specific information about Exosome's clients, pricing, research, and strategy;

B.    Grant expedited discovery, including the immediate turning over by Eitan to Exosome the flash drives with the serial numbers 5F0F9618&0 and 75896F68&0;

C.    Enter a Permanent Injunction restraining and enjoining Eitan and NeuroDex, respectively, from the conduct set forth in subparagraphs A(1)-A(3) above (including subparagraphs thereof), except that the non-disclosure and non-competition provisions shall be extended by the period of Eitan's noncompliance, such period of time equaling the length of time between the date Eitan ceased complying with his Non-Compete Agreement and ending on the date of the Court's Permanent Injunction;

D.    Require Eitan to reimburse Exosome for the costs it incurred in obtaining any and all relief in this action, including but not limited to, attorney's fees

incurred by Exosome;

**E.** Award Exosome monetary damages in an amount to be determined at trial, including exemplary and punitive damages, and including treble damages for NeuroDex's and Eitan's knowing and willful violations of M.G.L. c. 93A;

**F.** Award Exosome restitution for any unjust enrichment of NeuroDex and Eitan for its violations, in an amount to be determined at trial;

**G.** Enter a declaratory judgment confirming that Exosome owns or shall own any protocols for exosome assays or liquid biopsy products developed by Eitan or by anyone at NeuroDex using Exosome's confidential and trade secret information; and

**H.** Grant Exosome such other and further relief as this Court deems just and proper.

Dated:  December 3, 2018

Respectfully submitted,

EXOSOME DIAGNOSTICS, INC.

By Its Attorney,

*/s/ Adam S. Gershenson*
Adam S. Gershenson (BBO #671296)
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Tel.:  (617) 937-2300
Fax: (617) 937-2400
agershenson@cooley.com

## <u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED that on this 3rd day of December, 2018 the foregoing document, filed through the ECF system, will be sent electronically to the registered participants on the Notice of Electronic Filing and paper copies will be sent to any non-registered participants.

/s/ *Adam S. Gershenson*
Adam S. Gershenson

# EXHIBIT A



September 26, 2016

Erez Eitan
5713 Rockspring Road
Baltimore, MD 21209

Dear Erez,

On behalf of Exosome Diagnostics, Inc. (the "Company"), I am pleased to offer you the position of Scientist 1, Protein in our Cambridge R&D facility, commencing on or before December 1, 2016, contingent on your ability to work in the United States by that date. If you are unable to obtain the proper authorization to work in the United States by that date, the parties may agree to extend or terminate this offer in writing. You will receive an annual salary of $95,000, which will be paid in accordance with the Company's normal payroll procedures and you will work in the Cambridge, MA facility. This offer is subject to the terms and conditions set out below and upon satisfactory references from current and/or past employers.

During the Term, you will be eligible for an annual discretionary bonus (each a "Bonus") target value at 9% of Base Salary ("Target Bonus") for each calendar year completed during the Term (pro-rated for 2016), as determined in the sole and absolute discretion of the Compensation Committee of the Board (the "Compensation Committee") with reference to mutually agreed upon targets. Any Bonus will be paid in the form and at the same general time as bonuses for the calendar year for which such Bonus is earned are generally paid to other employees of the Company for such calendar year. To be eligible for a Bonus, you must be employed by the Company on the day that bonus checks are distributed and will have no claim for any Bonus for which such requirement in not satisfied notwithstanding the reason for termination.

You will be entitled to earn 1,000 options for common stock in Exosome Diagnostics, Inc. with a vesting calculated over a 4-year period with a vesting schedule of the first year vest upon the one year anniversary of the date of grant and then quarterly thereafter over the remaining 3-year period. There will also be a vesting acceleration clause in the event of a change of control. The strike price will be set at no higher than fair market value as determined under Sec 409A on the date of grant. This option grant is subject to approval of the Board of Directors at their next quarterly meeting following your first date of employment.

You will be entitled to company paid holidays in accordance with the Company's policies as in effect from time to time. You are eligible for four weeks Paid Time Off ("PTO") to be accrued throughout the year and pro-rata for this year. You are eligible to participate in the Company's health and other benefits.

While we hope your service with us is both long and fulfilling, the legal nature of our relationship will be at-will. This means that your employment relationship with the Company may be terminated at any time with or without notice, with or without good cause or for any or no cause, at either parties' option. You understand and agree that neither your job performance, nor promotions, commendations, bonuses or the like from the Company give rise to or in any way serve as the basis for modification, amendment, or extension, by implication or otherwise, of your employment with the Company.

For purposes of federal immigration law, you will be required to provide to the Company documentary evidence of your identity and eligibility for employment in the United States. Such documentation must be provided to us within three (3) business days of your date of hire, or our employment relationship with you may be terminated. We also ask that if you have not already done so, you disclose to the Company any and all agreements relating to your prior employment that may affect your eligibility to be employed by the Company or limit the manner in which you may be employed. The Company understands that any



such agreements will not prevent you from performing the duties of your position and you represent that such is the case. Moreover, you agree that, during the term of your employment with the Company, you will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of your employment, nor will you engage in any other activities that conflict with your obligations to the Company. Similarly, you agree not to bring any third party confidential information to the Company, including that of your former employer, and that in performing your duties for the Company you will not in any way utilize any such information.

You shall observe and abide by the Company's Articles of Incorporation, Bylaws and all rules, regulations and policies established from time to time by the Company or the Board of Directors, which are applicable to its employees. You agree to maintain the confidentiality of all confidential and proprietary information of the Company and will be required to sign an Employee Confidentiality and Development Assignment Agreement as a condition of your employment.

This agreement may be amended only by an agreement in writing executed by the Company and yourself. This letter shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts. The waiver by either party of a breach or default of any of the provisions of this agreement shall not be construed as a waiver of any subsequent breach of the same or any other provision. In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable, or void, this letter shall continue in full force and effect without such provision.

We are excited to welcome you to the team and look forward to working with you in growing the Company. We are confident that we will offer you a challenging, rewarding and enjoyable career with Exosome Diagnostics, Inc. This agreement and the other documents referred to in this agreement supersede all prior negotiations and agreements (whether written or oral) and constitute the entire understanding of each of us with regard to your employment.

Please indicate your acceptance by signing and returning to me a copy of this letter to my attention.

Sincerely,

William Kelly

CFO

Accepted by:

Erez Eitan SB
**Signature**

9.28.16
**Date**

# EXHIBIT B

## Non-Competition, Non-Solicitation, Confidentiality and Assignment Agreement

I, Erez Eitan, enter into this Agreement with Exosome Diagnostics, Inc. (the "Company" and, together with its direct and indirect subsidiaries, parent companies and holding companies, (individually and collectively the "Company Group") as a condition of my employment with the Company. I understand and agree that the terms of this Non-Competition, Non-Solicitation, Confidentiality and Assignment Agreement ("NNCA") are being incorporated by reference into the offer letter that I entered into with the Company dated September 26, 2016 (the "Employment Agreement") and that the provisions of this NNCA shall survive the Employment Agreement as well as the termination of my employment for any reason. With those understandings, I agree as follows:

**1.        Proprietary Information.** I agree that all information, whether or not in writing, concerning the Company Group's business, technology, assets, business relationships or affairs that the Company Group has not released to the general public (collectively, "Proprietary Information") is and will be the exclusive property of the Company.  By way of illustration, Proprietary Information may include information or material that has not been made generally available to the public, such as: (a) *corporate information*, including plans, strategies, methods, policies, resolutions, negotiations or litigation; (b) *marketing information*, including strategies, methods, customer identities or other information about customers, prospect identities or other information about prospects, or market analyses or projections; (c) *financial information*, including cost and performance data, debt arrangements, equity structure, investors and holdings, purchasing and sales data and price lists; and (d) *operational and technological information*, including plans, specifications, manuals, forms, templates, software, designs, methods, procedures, formulas, discoveries, inventions, improvements, concepts and ideas; and (e) *personnel information*, including personnel lists, reporting or organizational structure, resumes, personnel data, compensation structure, performance evaluations and termination arrangements or documents. Proprietary Information also includes information received in confidence by the Company Group from its customers or suppliers or other third parties.

**2.        Recognition of Company's Rights.** I will not, at any time, without the Company's prior written permission, either during or after my employment (whether or not under the Employment Agreement), disclose any Proprietary Information to anyone outside of the Company Group, or use or permit to be used any Proprietary Information for any purpose other than the performance of my duties as an employee of the Company.  I will cooperate with the Company Group and use my best efforts to prevent the unauthorized disclosure of all Proprietary Information. I will deliver to the Company all copies of Proprietary Information in my possession or control upon the earlier of a request by the Company or termination of my employment.

**3.        Rights of Others.** I understand that the Company Group is now and may hereafter be subject to non-disclosure or confidentiality agreements with third persons that require the Company Group to protect or refrain from use of proprietary information. I agree to be bound by the terms of such agreements in the event I have access to such proprietary information.

**4.        Commitment to the Company; Avoidance of Conflict of Interest.** While an employee of the Company Group, I will devote my full working time and efforts to the Company's business and I will not engage in any other business activity without prior authorization from the Company's Board of Directors. I will take whatever action is requested of me by the Board to resolve any conflict or appearance of conflict that it finds to exist.

**5.        Developments.** I will make full and prompt disclosure to the Company Group of all inventions, discoveries, designs, developments, methods, modifications, improvements, processes, algorithms, databases, computer programs, formulae, techniques, trade secrets, graphics or images, audio or visual works, and other works of authorship (collectively "Developments"), whether or not patentable or copyrightable, that are created, made, conceived or reduced to practice by me (alone or jointly with Others) or under my direction during the period of my employment.  I acknowledge that all work performed by me is on a "work for hire" basis, and I hereby do assign and transfer and, to the extent any such assignment cannot be made at present, will assign and transfer, to the Company and its successors and assigns all my right, title and interest in all Developments that (a) relate to the business of the Company Group or any

customer of or supplier to the Company Group or any of the products or services being researched, developed, manufactured or sold by the Company Group or which may be used with such products or services; or (b) result from tasks assigned to me by the Company Group; or (c) result from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company Group ("Company-Related Developments"), and all related patents, patent applications, trademarks and trademark applications, copyrights and copyright applications, and other intellectual property rights in all countries and territories worldwide and under any international conventions ("Intellectual Property Rights").

To preclude any possible uncertainty, I have set forth on Exhibit 1 attached hereto a complete list of Developments that I have, alone or jointly with others, conceived, developed or reduced to practice prior to the commencement of my employment with the Company Group that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement ("Prior Inventions"). If disclosure of any such Prior Invention would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Prior Inventions in Exhibit A but am only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs and the fact that full disclosure as to such inventions has not been made for that reason. I have also listed on Exhibit A all patents and patent applications in which I am named as an inventor, other than those which have been assigned to the Company ("Other Patent Rights"). If no such disclosure is attached, I represent that there are no Prior Inventions or Other Patent Rights. If, in the course of my employment with the Company Group, I incorporate a Prior Invention into a Company Group product, process or machine or other work done for the Company Group, I hereby grant to the Company Group a nonexclusive, royalty-free, paid-up, irrevocable, worldwide license (with the full right to sublicense) to make, have made, modify, use, sell, offer for sale and import such Prior Invention. Notwithstanding the foregoing, I will not incorporate, or permit to be incorporated, Prior Inventions in any Company-Related Development without the Company's prior written consent.

This Agreement does not obligate me to assign to the Company any Development which, in the sole judgment of the Company, reasonably exercised, is developed entirely on my own time and does not relate to the business efforts or research and development efforts in which, during the period of my

employment, the Company Group actually is engaged or reasonably would be engaged, and does not result from the use of premises or equipment owned or leased by the Company Group. However, I will also promptly disclose to the Company Group any such Developments for the purpose of determining whether they qualify for such exclusion. I understand that to the extent this Agreement is required to be construed in accordance with the laws of any state that precludes a requirement in an employee agreement to assign certain classes of inventions made by an employee, this paragraph 5 will be interpreted not to apply to any invention that a court rules and/or the Company agrees falls within such classes. I also hereby waive all claims to any moral rights or other special rights which I may have or accrue in any Company-Related Developments.

6.     **Documents and Other Materials.**  I will keep and maintain adequate and current records of all Proprietary Information and Company-Related Developments developed by me during my employment, which records will be available to and remain the sole property of the Company at all times.

All files, letters, notes, memoranda, reports, records, data, sketches, drawings, notebooks, layouts, charts, quotations and proposals, specification sheets, program listings, blueprints, models, prototypes, or other written, photographic or other tangible material containing Proprietary Information, whether created by me or others, which come into my custody or possession, are the exclusive property of the Company to be used by me only in the performance of my duties for the Company Group. Any property situated on the Company Group's premises and owned by the Company Group, including without limitation computers, disks and other storage media, filing cabinets or other work areas, is subject to inspection by the Company Group at any time with or without notice. In the event of the termination of my employment for any reason, I will deliver to the Company all files, letters, notes, memoranda, reports, records, data, sketches, drawings, notebooks, layouts, charts, quotations and proposals, specification sheets, program listings, blueprints, models, prototypes, or other written, photographic or other tangible material containing Proprietary Information, and other materials of any nature pertaining to the Proprietary Information of the Company Group and to my work, and will not take or keep in my possession any of the foregoing or any copies.

7.     **Enforcement of Intellectual Property Rights.**  I will cooperate fully with the Company Group, both during and after my employment with the Company Group, with respect to the procurement,

maintenance and enforcement of Intellectual Property Rights in Company-Related Developments. I will sign, both during and after the term of this Agreement, all papers, including without limitation copyright applications, patent applications, declarations, oaths, assignments of priority rights, and powers of attorney, which the Company Group may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development. If the Company Group is unable, after reasonable effort, to secure my signature on any such papers, I hereby irrevocably designate and appoint each officer of the Company as my agent and attorney-in-fact to execute any such papers on my behalf, and to take any and all actions as the Company Group may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development.

**8. Non-Competition and Non-Solicitation.** In order to protect the Company Group's Proprietary Information and good will, during my employment and for either: (i) the six-month period that immediately follows the date of termination if such termination occurs prior to the one-year anniversary of the Start Date (as defined in the Employment Agreement), or (ii) the twelve-month period that immediately follows the date of termination if such termination occurs on or after the one-year anniversary of the Start Date (in either event the "Restricted Period"), I will not directly or indirectly, whether as owner, partner, stockholder, director, manager, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any business activity anywhere in the world that develops, manufactures or markets any products, or performs any services related to the Business. For the purposes of this Agreement I understand and agree that "Business" means research, development and commercialization of Exosome-based or microvesicle-based products for diagnostic or therapeutic use and any other business engaged in by the Company during my employment or in which the Company actively planned during my employment. I understand that this Section 8 shall not prohibit any possible investment in publicly traded stock of a company representing less than one percent (1%) of the stock of such company. In addition, during the Restricted Period, I will not, directly or indirectly, in any manner, other than for the benefit of the Company Group, (a) call upon, solicit, divert, take away, accept or conduct any business from or with any of the customers or prospective customers of the Company Group or any of its suppliers for purposes related to the Business, and/or (b) solicit, entice, attempt to persuade any other employee or consultant of the Company Group to leave the Company Group for any reason or otherwise participate in or facilitate the hire, directly or through another entity, of any person who is employed or engaged by the Company Group or who was employed or engaged by the Company Group within six (6) months of any attempt to hire such person. I

acknowledge and agree that if I violate any of the provisions of this paragraph 8, the running of the Restricted Period will be extended by the time during which I engage in such violation(s).

**9. Government Contracts.** I acknowledge that the Company Group may have from time to time agreements with other persons or with the United States Government or its agencies that impose obligations or restrictions on the Company Group regarding inventions made during the course of work under such agreements or regarding the confidential nature of such work. I agree to comply with any such obligations or restrictions upon the direction of the Company Group. In addition to the rights assigned under paragraph 5, I also assign to the Company (or any of its nominees) all rights which I have or acquired in any Developments, full title to which is required to be in the United States under any contract between the Company Group and the United States or any of its agencies.

**10. Prior Agreements.** I hereby represent that I am not bound by the terms of any agreement with any previous employer or other party to refrain from using or disclosing any trade secret or confidential or proprietary information in the course of my employment with the Company Group or to refrain from competing, directly or indirectly, with the business of such previous employer or any other party. I further represent that my performance of all the terms of this Agreement as an employee of the Company Group does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my employment with the Company Group. I will not disclose to the Company Group or induce the Company Group to use any confidential or proprietary information or material belonging to any previous employer or others.

**11. Remedies Upon Breach.** I understand that the restrictions contained in this Agreement are necessary for the protection of the business and goodwill of the Company Group and I consider them to be reasonable for such purpose. Any breach of this Agreement is likely to cause the Company Group substantial and irrevocable damage and therefore, in the event of such breach, the Company, in addition to such other remedies which may be available, will be entitled to specific performance and other injunctive relief, without posting of a bond. Further, I understand that in the event that the Company prevails in any action or proceeding to enforce or interpret the provisions of this Agreement with respect to me, or to recover for a violation of this Agreement, the Company shall be entitled to its costs and reasonable attorneys' fees.

**12.     Survival and Assignment by the Company.**
I understand that my obligations under this Agreement will continue in accordance with its express terms regardless of any changes in my title, position, duties, salary, compensation or benefits or other terms and conditions of employment. I further understand that my obligations under this Agreement will continue following the termination of my employment regardless of the manner of such termination and will be binding upon my heirs, executors and administrators. The Company will have the right to assign this Agreement within the Company Group and to the successors and assigns of any member of the Company Group. I expressly

consent to be bound by the provisions of this Agreement for the benefit of the Company Group or any parent, subsidiary or affiliate to whose employ I may be transferred without the necessity that this Agreement be re-executed at the time of such transfer.

**13.     Disclosure to Future Employers.** During the Restricted Period, I will provide a copy of this Agreement to any prospective employer, partner or co-venturer prior to entering into an employment, partnership or other business relationship with such person or entity. In addition, I will notify the Company of any change in my address and of each subsequent employment or business activity, including the name or address of my employer or other post-employment plans and the nature of my activities.

**14.     Severability.** In case any provisions (or portions thereof) contained in this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

**15.     Defend Trade Secrets Act of 2016.** I acknowledge receipt of the following notice under 18 U.S.C § 1833(b)(1): "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a

lawsuit or other proceeding, if such filing is made under seal.

**Interpretation.** This Agreement will be deemed to be made and entered into in the Commonwealth of Massachusetts, and will in all respects be interpreted, enforced and governed under the laws of the Commonwealth of Massachusetts. I hereby agree to consent to personal jurisdiction of the state and federal courts situated within Massachusetts for purposes of enforcing this Agreement, and waive any objection that I might have to personal jurisdiction or venue in those courts.

I UNDERSTAND THAT THIS AGREEMENT AFFECTS IMPORTANT RIGHTS. BY SIGNING BELOW, I CERTIFY THAT I HAVE READ IT CAREFULLY AND AM SATISFIED THAT I UNDERSTAND IT COMPLETELY.

IN WITNESS WHEREOF, the undersigned has executed this agreement as a sealed instrument as of the date set forth below.

Name (print):  Eriz Eilan

Signed:

Date:  1, 4, 2017

## EXHIBIT 1

To:   Exosome Diagnostics, Inc.

From:

Date:   _____

SUBJECT:   **Prior Inventions**

      The following is a complete list of all inventions or improvements relevant to the subject matter of my employment by the Company that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company:

☐     No inventions or improvements

☐     See below:

_____

_____

_____

Additional sheets attached

      The following is a list of all patents and patent applications in which I have been named as an inventor:

☐     None

☐     See below:

_____

_____

_____

# EXHIBIT C



June 13, 2018

Erez Eitan
72 Eustis Street, Apt 2
Cambridge, MA 02140

Re: Separation Agreement

Dear Erez:

As we have discussed, your employment with Exosome Diagnostics, Inc. (the "Company") will be ending effective today, June 13, 2018 (the "Separation Date"). We appreciate your service and would like to make your transition from the Company as smooth as possible. Consistent with that, this letter proposes an agreement between you and the Company that allows you to receive post-employment pay and benefits to which you are not otherwise entitled.

In the interest of clarity, the following terms and conditions shall apply regardless of whether you elect to accept or reject the Agreement (as defined below):

- The Company will pay you: (i) your salary, (ii) for 97.8 hours of accrued but unused Paid Time Off, and (iii) for any of your properly-incurred and documented business expenses, all through the Separation Date.

- The Company will provide you with the right to continue group medical care coverage after the termination of your employment under the law known as "COBRA," which will be described in a separate written notice.

- Your eligibility to participate in employee benefit plans and programs of the Company will cease on or after the Separation Date in accordance with applicable benefit plan or program terms and practices.

- Under your Incentive Stock Option Agreement dated March 20, 2017 you were granted 1000 options to purchase Company common stock (the "March 2017 Agreement"). Under your Incentive Stock Option Agreement dated August 16, 2017 you were granted 1000 options to purchase Company common stock (the "August 2017 Agreement"). As of the date of this letter, your option to purchase up to 250 shares of Company common stock under the March 2017 Agreement is vested (the "Vested Shares") and your options to purchase 750 shares of Company common stock under the March 2017 Agreement, and all 1000 shares under the August 2017 Agreement are unvested (the "Unvested Shares"). Your Unvested Shares shall expire and be null and void as of the Separation Date. The Option Agreements, with the Amended and Restated 2009 Stock Option Plan and any associated agreements, are referred to as the "Equity Documents". Your option to purchase the Vested Shares remains subject to the Equity Documents. You

acknowledge and agree that you have no equity interest or other interest in the Company other than the Vested Shares.

- For your part, you are subject to continuing obligations under the Non-Competition, Non-Solicitation, Confidentiality and Assignment Agreement signed by you on January 4, 2017 (the "Employee Agreement"), including but not limited to your confidentiality, non-competition, non-solicitation and return of documents and materials obligations.  A copy of the Employee Agreement is enclosed.  Your obligations under the Employee Agreement, and any other restrictive obligation you have to the Company, are referred to collectively as the "Continuing Obligations."

With those understandings, you and the Company agree to the following "Agreement":

1.   **Separation from Employment**

This confirms that your employment with the Company will end effective on the Separation Date.  You further confirm that you have resigned from any and all other positions that you hold with the Company.  You acknowledge that you have been paid for all salary and accrued but unused vacation that was owed to you.

2.   **Severance Pay**

If you enter into and comply with this Agreement, the Company shall pay you severance pay consisting of a lump sum payment in an amount equal to three (3) months at your final base salary rate, subject to applicable deductions and withholdings ("Severance Pay").  The Company shall pay you Severance Pay on the first business day following the Effective Date of this Agreement (as defined below in Section 15).

3.   **Return of Property**

In addition to your Continuing Obligation to return documents and materials containing Proprietary Information (as defined in the Employee Agreement), you confirm that, to the best of your knowledge, you have returned to the Company all Company property, including without limitation, computer equipment, software, keys and access cards, credit cards, files and any documents (including computerized data and any copies made of any computerized data or software) containing information concerning the Company, its business or its business relationships.  In the event that you discover that you continue to retain any such property, you shall return it to the Company immediately.

4.   **Non-Disparagement**

As a material term of this Agreement, you agree not to make any disparaging statements concerning the Company, its products or services or any of the Company's affiliates or current or former officers, directors, shareholders, employees or agents.  You further agree not to take any actions or conduct yourself in any way that would reasonably be expected to affect adversely the reputation or goodwill of the Company or any of its affiliates or any of its current or former officers, members, directors, shareholders, employees or agents.  These non-disparagement

2

obligations shall not in any way affect your obligation to testify truthfully in any legal proceeding.

## 5.  Release of Claims

In consideration for, among other terms, the Severance Pay, to which you acknowledge you would otherwise not be entitled, you voluntarily release and forever discharge the Company and Insperity PEO Services, L.P., formerly known as Administaff Companies II, L.P., ("Insperity"), their respective and former parent companies, subsidiaries and other affiliated and related entities, its and their respective predecessors, successors and assigns, its and their respective employee benefit plans and fiduciaries of such plans, and their respective current and former officers, directors, shareholders, employees, attorneys, accountants and agents of each of the foregoing in their official and personal capacities (collectively referred to as the "Releasees") generally from all claims, demands, debts, damages and liabilities of every name and nature, known or unknown ("Claims") that, as of the date when you sign this Agreement, you have, ever had, now claim to have or ever claimed to have had against any or all of the Releasees through the date you sign this Agreement.  This release includes, without limitation, all Claims:

- relating to your employment by and the decision to terminate your employment with the Company;
- of wrongful discharge;
- of breach of contract;
- of retaliation or discrimination under federal, state or local law (including, without limitation, Claims of discrimination or retaliation under the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, Massachusetts Gen. L. ch. 151B and the Age Discrimination in Employment Act of 1967);
- under any other federal or state statute;
- of defamation or other torts;
- of violation of public policy;
- for wages, bonuses, incentive compensation, stock, stock options, vacation pay or any other compensation or benefits, either under the Massachusetts Wage Act or otherwise; and
- for damages or other remedies of any sort, including, without limitation, compensatory damages, punitive damages, injunctive relief and attorney's fees;

*provided*, however, that this release shall not affect your vested rights, if any, under the Company's Section 401(k) plan or your rights under this Agreement.

You agree not to accept damages of any nature, other equitable or legal remedies for your own benefit or attorney's fees or costs from any of the Releasees with respect to any Claim released by this Agreement.  You represent that you have not assigned or transferred any Claim or the rights to any third party.

## 6.  Disclaimer for Promised Payment

For the avoidance of any doubt, you agree that the Severance Pay to be paid under this Agreement is due solely from the Company and that Insperity has no obligation to pay the Severance Pay, even though its payment may be processed through Insperity.

## 7. Confidentiality of Agreement

You agree to keep the existence and terms of this Agreement ("Agreement-Related Information") in the strictest confidence and not reveal, unless legally compelled to do so, any Agreement-Related Information to any persons except your immediate family, your attorney and your financial advisors, and to them only provided that they first agree for the benefit of the Company to keep Agreement-Related Information confidential. Nothing in this Section or Agreement shall be construed to prevent you from disclosing Agreement-Related Information to the extent required by a lawfully issued subpoena or duly issued court order, provided that you provide the Company with advance written notice and a reasonable opportunity to contest such subpoena or court order.

## 8. Effect of a Breach

In the event that you fail to comply with any of your obligations under this Agreement, including without limitation your Continuing Obligations, in addition to any other legal or equitable remedies it may have for such breach, the Company shall have the right to suspend, terminate and/or recover the Severance Pay from you. The termination of such payments in the event of your breach will not affect your continuing obligations or release of Claims under this Agreement.

## 9. Non-Admission

This Agreement shall not be construed as an admission of any liability by the Company to you or of any act of wrongdoing by the Company. The Company specifically disclaims that it or any of its representatives has engaged in any wrongdoing or has taken any action that would be the basis for any finding of liability.

## 10. Absence of Reliance

In signing this Agreement, you are not relying upon any promises or representations made by anyone at or on behalf of the Company.

## 11. Enforceability

If any portion or provision of this Agreement (including, without limitation, any portion or provision of any section of this Agreement) shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

## 12. Jurisdiction

You and the Company hereby agree that the state and federal courts in Massachusetts having subject matter jurisdiction shall have the exclusive jurisdiction to consider any matters related to this Agreement, including without limitation any claim for violation of this Agreement. With respect to any such court action, you and the Company (i) submit to the personal jurisdiction of

such courts, (ii) consent to service of process, and (iii) waive any other requirement (whether imposed by statute, rule of court or otherwise) with respect to personal jurisdiction or venue.

### 13.    Governing Law; Interpretation

This Agreement shall be interpreted and enforced under the laws of the Commonwealth of Massachusetts, without regard to conflict of law principles. In the event of any dispute, this Agreement is intended by the parties to be construed as a whole, to be interpreted in accordance with its fair meaning, and not to be construed strictly for or against either you or the Company or the "drafter" of all or any portion of this Agreement.

### 14.    Entire Agreement

This Agreement constitutes the entire agreement between you and the Company and supersedes any previous agreements or understandings between you and the Company, except the Employee Agreement, your Continuing Obligations, the Equity Documents, and any other obligations specifically preserved in this Agreement.

### 15.    Time for Consideration; Effective Date

You acknowledge that you have been given the opportunity to consider this Agreement for twenty-one (21) days before signing it (the "Consideration Period") and that you have knowingly and voluntarily entered into this Agreement. To accept this Agreement, you must return a signed original or a signed PDF copy of this Agreement as well as all Company Proprietary Information and property so that it is received by the undersigned at or before the expiration of the Consideration Period. If you sign this Agreement before the end of the Consideration Period, you acknowledge by signing this Agreement that such decision was entirely voluntary and that you had the opportunity to consider this Agreement for the entire Consideration Period. In addition, should you sign this Agreement, you have an additional seven (7) days from the date of your execution of this agreement to reconsider and potentially revoke your acceptance of this Agreement should you change your mind (the "Revocation Period"). This Agreement shall become effective on the date when it becomes fully executed and the Revocation Period has lapsed (the "Effective Date").

### 16.    Protected Disclosures

Nothing contained in this Agreement (including, without limitation, the Employee Agreement) or otherwise limits: your obligation to testify truthfully in any legal proceeding; your ability to communicate with any government agency or otherwise participate in any investigation or proceeding that may be conducted by any government agency, including your ability to provide documents or other information, without notice to the Company.

### 17.    Counterparts

This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be taken to be an original, but all of which together shall constitute one and the same document. Facsimile and pdf signatures shall be deemed to have the same legal effect as originals.

Very truly yours,

By: _____
    William J. Kelly
    Chief Financial Officer

6-13-2018
_____
Date

The foregoing is agreed to and accepted by:

_____
Erez Eitan

7-2-2018
_____
Date

Enclosure:    Employee Agreement